**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-1360

DANTE COAL COMPANY,

Petitioner,

versus

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR;
NORA JONES, on behalf of Stanley Jones,
Respondent,

Respondents.

On Petition for Review of an Order of the Benefits Review Board.
(03-278-BLA)

Argued:  October 25, 2005          Decided:  January 26, 2006

Before WILKINS, Chief Judge, and WILKINSON and GREGORY, Circuit
Judges.

Affirmed by unpublished opinion.  Judge Gregory wrote the majority
opinion, in which Judge Wilkinson joined.  Chief Judge Wilkins
wrote a dissenting opinion.

**ARGUED:** William Steele Mattingly, JACKSON KELLY, P.L.L.C.,
Morgantown, West Virginia, for Petitioner. James Hook, Waynesburg,
Pennsylvania, for Respondents. **ON BRIEF:** Ashley M. Harman, JACKSON
KELLY, P.L.L.C., Morgantown, West Virginia, for Petitioner.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

GREGORY, Circuit Judge:

This appeal concerns a twenty-six-year-old dispute over the award of black lung benefits to claimant Stanley Jones ("Jones"). For the second time, Dante Coal Company ("Dante") asks this Court to reverse an order of the Benefits Review Board (the "Board") affirming an administrative law judge's ("ALJ") award of black lung benefits to Jones. Dante contends that the ALJ erred by failing to reconsider fully all the pertinent evidence and by relying on a revised definition of pneumoconiosis without allowing the parties' experts to reevaluate the evidence. Finding no error, we affirm the Board's decision.

I.

A.

Jones, born on January 13, 1921, worked in the coal mines of West Virginia for thirty-two years until he was laid off in 1981. J.A. 286. He also smoked cigarettes for nearly forty years, until 1978, and began to experience respiratory difficulties while working for Dante (formerly Badger Coal Company and Wolverine Mining Company), his final coal mine employer. J.A. 25.

On October 19, 1979, Jones filed an application for lifetime black lung benefits under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901-945 ("Black Lung Benefits Act" or the "Act"). In his application, Jones

2

asserted that he suffered from a coal dust-induced disorder called pneumoconiosis. As he filed his claim before April 1, 1980, the effective date of the permanent regulations governing black lung benefits, his claim must be adjudicated under interim regulations found in 20 C.F.R. Part 727.[1]

This case, adjudicated before three different ALJs, involves a complicated procedural history, most of which is not relevant here. Accordingly, we limit our recitation to those facts pertinent to our discussion, beginning with the second ALJ's denial of Jones's claim for benefits in 1997. Jones opted not to appeal that determination and instead, he filed a petition for modification under 20 C.F.R. § 725.310 based on new evidence. J.A. 30-31. Section 725.310 provides that a party may request modification of the denial of benefits within one year of the denial on the grounds that a change in conditions has occurred or because the previous decision reflected a mistake in the determination of a fact, or in the ultimate determination of the claimant's entitlement to benefits. 20 C.F.R. § 725.310(a) (1979); see also Jesse v. Dir., OWCP, 5 F.3d 723, 725 (4th Cir. 1993).

---

[1]Under the interim regulations, claimants with at least ten years of coal mine employment are entitled to a presumption of total disability due to pneumoconiosis if chest x-rays are positive for pneumoconiosis, ventilatory studies yield qualifying results, blood gas studies produce qualifying results, or if other medical evidence, including the well-reasoned opinion of a medical doctor, establishes the existence of a totally disabling respiratory or pulmonary impairment. See 20 C.F.R. § 727(a)(1)-(4).

In support of his petition for modification, Jones submitted an expert report from Dr. Roger Abrahams.  Dante responded with the medical reports of Drs. James Castle and Gregory Fino.  All three physicians found that Jones was not suffering from medical pneumoconiosis, which "refers to the lung disease caused by fibrotic reaction of the lung tissue to inhaled dust, which is generally visible on chest x-ray films as opacities."  Hobbs v. Clinchfield Coal Co., 917 F.2d 790, 791 (4th Cir. 1990). The physicians, however, disagreed over whether Jones was suffering from legal pneumoconiosis, a broader class of disorders.  Legal pneumoconiosis is "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  30 U.S.C. § 902 (1979); see also Hobbs, 917 F.2d at 791 ("Legal pneumoconiosis refers to all lung diseases which meet the statutory or regulatory definition of being any lung disease which is significantly related to, or substantially aggravated by, dust exposure in coal mine employment.").[2]  Additionally, all of the physicians found that

---

[2]Legal pneumoconiosis "is not limited to, coal workers' pneumoconiosis [i.e., medical pneumoconiosis], anthracosilicosis, anthracosisanthro-silicosis, massive pulmonary fibrosis, progressive massive fibrosis silicosis, or silicotuberculosis arising out of coal mine employment."  20 C.F.R. § 727.202 (1979). Rather, it has "a broad definition, one that effectively allows for the compensation of miners suffering from a variety of respiratory problems that may bear a relationship to their employment in the coal mines."  Rose v. Clinchfield Coal Co., 614 F.2d 936, 938 (4th Cir. 1980).   For example, it includes emphysema, asthma, and chronic bronchitis, if triggered by coal mine employment.  Hughes

Jones had a pulmonary obstructive disorder, but disagreed as to whether this disorder was due to the combined effects of coal mine dust exposure and cigarette smoke or simply the latter.

B.

Jones relied on Dr. Abrahams's opinion to demonstrate his entitlement to a presumption of total disability due to pneumoconiosis. Dr. Abrahams, B-reader[3] and board-certified internal medicine physician with a subspecialty in pulmonary diseases, examined Jones on June 4, 1998. In a report generated in 1999, Dr. Abrahams noted, inter alia, that Jones had a chronic, productive cough; no history of pneumonia or tuberculosis; a moderate obstructive ventilatory impairment; negative chest x-ray and CT scan; mild hypoxia; chronic wheezing; dyspnea on exertion; and asymptomatic gastroesophageal reflux disease. J.A. 226-27. Although Dr. Abrahams observed that on June 4, 1998, Jones had a moderate obstructive ventilatory impairment with very significant bronchoreversibility,[4] studies performed in 1995 and 1999 showed a

---

v. Clinchfield Coal Co., 21 Black Lung Rep. 1-134 (Ben. Rev. Bd. 1999); Robinson v. Dir., OWCP, 3 Black Lung Rep. 1-798.7 (Ben. Rev. Bd. 1982); Tokarcik v. Consolidation Coal Co., 6 Black Lung Rep. 1-666 (Ben. Rev. Bd. 1983).

[3]B-readers are physicians who have passed an exam indicating that they are proficient in interpreting x-rays for the presence of pneumoconiosis and other diseases. 20 C.F.R. § 718.202(a)(1)(E) (2005).

[4]Bronchoreversibility refers to the reduction in airway obstruction that results when bronchodilator medications are administered to a person with a reversible airway obstruction. See

5

moderate obstructive airway impairment without marked reversibility. J.A. 227. During his deposition, Dr. Abrahams explained why Jones responded to bronchodilator medications in 1998, but not in 1999. Dr. Abrahams opined that there was no improvement in 1999 because Jones had achieved his maximal level of dilation before the test was administered in 1999, most likely through the use of prescribed bronchodilator medications. J.A. 259-60. Importantly, even after the administration of the bronchodilator medications, Jones still exhibited a significant amount of obstruction, which rendered him disabled under the relevant regulations. Thus, Dr. Abrahams's review of the ventilatory studies led him to conclude that Jones suffers from a totally disabling respiratory condition.

With regard to causation, Dr. Abrahams expressed a view that "[b]oth coal dust and cigarette smoke can cause bronchitis and obstructive airway disease and on an individual basis it is impossible to determine the degree to which each factor contributed to the impairment." J.A. 229. Accordingly, he concluded that Jones has moderate obstructive airway disease due to the combined effects of industrial bronchitis (as a result of coal dust exposure) and cigarette smoke. J.A. 229. In his report, Dr. Abrahams cited various studies for the principles that (1) chronic

J.A. 103. According to Drs. Castle and Fino, pneumoconiosis does not respond to bronchodilator medications because coal dust does not cause a reversible obstruction. See, e.g., J.A. 103.

coal dust exposure can cause chronic bronchitis and chronic airflow obstruction, (2) one can have a negative x-ray and still suffer from the deleterious effects of coal dust exposure, and (3) smoking and coal dust have additive effects on airway obstruction. J.A. 228.

### C.

Dante offered the opinions of Drs. Castle and Fino to rebut the presumption of total disability due to pneumoconiosis. They both contended that Jones does not have pneumoconiosis and attributed Jones's respiratory difficulties to factors other than coal dust inhalation. We turn first to Dr. Castle's evaluation.

Dr. Castle, a B-reader and board-certified internal medicine physician with a subspecialty in pulmonary diseases, evaluated Jones on May 4, 1999. Although Dr. Castle acknowledged that Jones had sufficient exposure to coal dust as to have developed pneumoconiosis, he did not find any signs of coal workers' pneumoconiosis on physical examination, radiographic evaluation, physiologic testing, or examination of arterial blood gas levels. J.A. 56, 104.

Instead, Dr. Castle diagnosed Jones as suffering from a moderate airway obstruction due to tobacco smoke and chronic obstructive pulmonary disease. J.A. 56. He arrived at this conclusion for several reasons. Dr. Castle noted the absence of several symptoms associated with medical pneumoconiosis. For

7

example, he observed that the vast majority of radiologists and B-readers did not see radiographic evidence of coal workers' pneumoconiosis. J.A. 63. He did not find evidence of an interstitial pulmonary process on physical exam as there were no rales, crackles, or crepitations on a regular basis. J.A. 63. He found that Jones's physiologic studies suggested moderate airway obstruction without any diffusion abnormality. J.A. 63. According to Dr. Castle, "where one has significant interstitial fibrosis [i.e., scarring] or fibrosis of a severe degree or significant degree, then one would expect the diffusing capacity to be abnormal." J.A. 117-18.

Several other characteristics of Jones's impairment led Dr. Castle to conclude that Jones is not afflicted with pneumoconiosis. Dr. Castle found that Jones did not have a restrictive impairment (i.e., Jones had normal lung volumes). J.A. 63. To Dr. Castle, this finding was not suggestive of pneumoconiosis because "[w]hen coal workers' pneumoconiosis causes clinically significant impairment, it does so generally by causing a mixed, irreversible obstructive <u>and</u> restrictive ventilatory impairment." J.A. 63 (emphasis added). Dr. Castle further stated that the fact that Jones's respiratory condition improved in response to bronchodilator medications signaled that his condition is not coal dust-induced, because chronic dust-induced lung diseases are not typically associated with a reversible airway obstruction. J.A.

8

103. He dismissed Dr. Abrahams's conclusion that the obstruction is a manifestation of industrial bronchitis, because Dr. Castle said industrial bronchitis is a condition that only occurs while one is actively exposed to coal dust and that it disappears six months after the coal mine employment has ended. J.A. 64. He also maintained that Jones did not disclose to him a history of a productive cough[5] and thus that Jones did not meet the criteria for chronic bronchitis. J.A. 101.

Dr. Fino, a B-reader and board-certified internal medicine physician with a subspecialty in pulmonary diseases, reviewed the reports and testing of other physicians in rendering his opinion, but did not conduct any independent examinations or testing. Although he found that Jones had worked in the coal mines long enough to develop coal worker's pneumoconiosis, J.A. 179, he nonetheless concluded that Jones does not suffer from an occupationally acquired pulmonary condition. J.A. 82. While Dr. Fino also found that Jones suffers from a disabling respiratory condition and has an obstructive ventilatory abnormality, he concluded that it is not due to coal dust inhalation, but rather to smoking. J.A. 83.

---

[5]In fact, Dr. Castle's report states that Jones's cough was "<u>generally</u>" nonproductive. J.A. 53 (emphasis added). Yet, in his deposition, Dr. Castle testified that Jones had a dry cough. J.A. 100.

Dr. Fino arrived at his conclusion for several reasons. Like Dr. Castle, he ruled out pneumoconiosis based on an absence of symptoms typically associated with medical pneumoconiosis. First, he found that the x-ray evidence did not support a finding of pneumoconiosis. J.A. 82. Second, he noted that much of the medical data was not indicative of fibrosis of the lung tissue. For example, the pulmonary function studies showed an obstructive ventilatory abnormality, but there was no evidence of interstitial abnormality. J.A. 82. He noted that Jones's lungs had normal diffusing capacities, and thus, there could not be a significant pulmonary fibrosis preventing the passage of air from the lungs to the blood. J.A. 82, 173. Likewise, he found that Jones had elevated lung volumes, not consistent with fibrosis, which results in lower lung volumes. J.A. 83. He also concluded that the variability of Jones's condition was not consistent with pneumoconiosis, because coal dust causes permanent fibrosis. J.A. 170.

Dr. Fino provided some additional justifications for concluding that Jones is not suffering from pneumoconiosis. He observed that the flow of air through Jones's small airways was more reduced than the flow of air through Jones's large airways. J.A. 82. According to Dr. Fino, this finding, coupled with his belief that coal dust cannot reach the lungs' small airways, suggested a smoke-induced condition. J.A. 186. Dr. Fino dismissed

10

the possibility that Jones suffers from an obstructive lung disease in miners called "industrial bronchitis" because he claimed that such a condition clears up within six to twelve months of leaving the mines.  J.A. 176.

Upon the OWCP's denial of Jones's petition for modification on February 18, 1998, the case was once again referred to the Office of Administrative Law Judges.  J.A. 286.  At this time, the case was assigned to Judge Daniel Leland, the third ALJ to consider Jones's case.  After reviewing x-ray results, pulmonary function studies, blood gas tests, and the three physicians' medical reports, Judge Leland found a change of circumstances.  Based on the evidence before him, Judge Leland concluded that Jones was entitled to a presumption of disability based on four qualifying ventilatory studies and Drs. Abrahams and Fino's conclusion that Jones suffers from a totally disabling respiratory impairment.[6]  J.A. 292.  Finding that Dante failed to rebut the presumption,

---

[6]Unlike Drs. Fino and Abrahams, Dr. Castle did not consider Jones to be disabled based on his lung function.  J.A. 124.  Instead, he concluded that Jones was disabled as a result of his cardiac disease and age. J.A. 124.  Importantly, as noted by Judge Leland in his initial opinion, Dr. Castle's assessment that Jones's pulmonary function placed him above federal disability levels, J.A. 64, was based on the final regulations, which are not applicable to Jones, rather than the interim regulations.  J.A. 292.  At deposition, Dr. Castle admitted that he was not familiar with the Department of Labor's 1979 standards.  J.A. 131-32.  Thus, Judge Leland properly discredited Dr. Castle's determination of nondisability, because Dr. Castle evaluated Jones according to the wrong disability standards.  J.A. 292.

11

Judge Leland awarded black lung benefits on February 9, 2000, a finding the Board affirmed on April 20, 2001. J.A. 294, 302.

Thereafter, Dante appealed the Board's order to this Court. J.A. 304. At that time, we held that Judge Leland erred in relying on a conclusion that pneumoconiosis is always a progressive and irreversible disease to discredit Dante's experts. See Dante Coal Co. v. Jones, 37 Fed. Appx. 637, 639 (4th Cir. June 11, 2002) (unpublished). We stated that the conclusion that all forms of pneumoconiosis are progressive and irreversible, even if correct, would not serve to discredit Drs. Castle and Fino's other bases for concluding that Jones does not have pneumoconiosis, nor would such a conclusion advance Jones's position because Dr. Abrahams had testified that pneumoconiosis can be reversible. Id. We vacated the Board's decision and remanded to the Board "for further remand to the ALJ so that he may properly weigh the relevant evidence." Id. at 639-40.

In his December 20, 2002 opinion on remand, Judge Leland again awarded benefits, based on a finding that Dante's evidence did not rebut Jones's presumption of disability. J.A. 312. Judge Leland started from the premise that Jones is totally disabled due to pneumoconiosis, because Dante did not challenge his earlier determination that Jones is entitled to the presumption based on qualifying ventilatory studies and reasoned medical opinions. J.A. 309. He also adopted his earlier conclusion that Dante could not

12

rebut the presumption by showing that Jones is doing coal mine or comparable work (see 20 C.F.R. § 727(b)(1)) or that he is capable of doing such work (see 20 C.F.R. § 727(b)(2)), because Dante had not appealed that determination. Indeed, each of the doctors agreed that Jones is disabled, thus incapable of doing coal mine or comparable work, whether because of his age, cardiac condition, or pulmonary problems. J.A. 83, 124, 248-49. Accordingly, Judge Leland devoted his opinion to examining whether Dante had rebutted the presumption by showing that there was no causal relationship between Jones's total disability and coal mine employment (see 20 C.F.R. § 727(b)(3)) or by showing that Jones does not have medical or legal pneumoconiosis (see 20 C.F.R. § 727(b)(4)). J.A. 309. He concluded that Dante had not carried its burden to rebut the presumption because Drs. Castle and Fino's opinions were based on questionable reasoning.

The Board affirmed the award of benefits on January 30, 2004, with one judge dissenting. J.A. 314-22. Dante again petitioned this Court for review of the Board's decision.

II.

This Court must assess whether the Board properly concluded that the ALJ's decision was supported by substantial evidence. Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). In so doing, we perform an independent review of the record to

13

determine whether the ALJ's findings of fact are supported by substantial evidence. Consolidation Coal Co. v. Held, 314 F.3d 184, 186 (4th Cir. 2002) (citing Island Creek Coal Co. v. Compton, 211 F.3d 203, 207 (4th Cir. 2000)). Although we must make an independent examination of the evidence, we may not "set aside an inference merely because [we] find[] the opposite conclusion more reasonable or because [we] question[] the factual basis." Doss v. Dir., OWCP, 53 F.3d 654, 659 (4th Cir. 1995) (quoting Smith v. Dir., OWCP, 843 F.2d 1053, 1057 (7th Cir. 1988)).

Substantial evidence is evidence which "a reasonable mind might accept as adequate to support a conclusion." NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1269 (4th Cir. 1994) (internal quotation marks omitted). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

As an initial matter, we must ensure that the ALJ has complied with the Administrative Procedures Act ("APA") by analyzing "all of the relevant evidence" and providing "a sufficient explanation for [his] 'rationale in crediting certain evidence.'" Bill Branch Coal Corp. v. Sparks, 213 F.3d 186, 190 (4th Cir. 2000) (quoting Milburn Colliery Co., 138 F.3d at 528). An ALJ discharges this duty only when he analyzes all the relevant evidence and provides an explanation for his decision to credit particular pieces of

14

evidence over others. Arnold v. Sec. of HEW, 567 F.2d 258, 259 (4th Cir. 1977) ("Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." (quotation marks and citations omitted)). The ALJ's duty is to provide an explanation sufficient for him to reach the correct result and so that this Court can discharge its duty. Lane Hollow Coal Co. v. Dir., OWCP, 137 F.3d 799, 803 (4th Cir. 1994). "If this Court understands what the ALJ did and why he did it, we, and the APA, are satisfied." Id.

The claims of persons like Jones who filed requests for black lung benefits before April 1, 1980, are reviewed under the interim regulations at 20 C.F.R. Part 727. Mullins Coal Co. v. Dir., OWCP, 484 U.S. 135, 137-38 (1987). Under those regulations, a miner with ten years of experience in the mining industry is presumed to be totally disabled due to pneumoconiosis if any of the following conditions is met:

(1)  a chest x-ray, biopsy, or autopsy establishes the existence of pneumoconiosis;

(2)  ventilatory studies establish the presence of a chronic respiratory or pulmonary disease of a certain severity and duration;

(3)  blood gas studies demonstrate impairment in the transfer of oxygen from the lungs to the blood;

15

(4)   other medical evidence, including a reasoned medical opinion, demonstrates the presence of a totally disabling respiratory or pulmonary impairment.

20 C.F.R. § 727.203(a).  Once the claimant establishes entitlement to the presumption of disability due to pneumoconiosis, the employer carries the burden of rebutting that presumption.  Id. The presumption shall be rebutted if:

(1)   the individual is doing his usual coal mine work or comparable work;

(2)   the claimant is able to do his usual coal mine work or comparable work;

(3)   the disability did not arise, in whole or in part, out of coal mine employment; or

(4)   the claimant does not have pneumoconiosis.

20 C.F.R. § 727.203(b).

Dante concedes that Jones is entitled to the presumption of disability due to pneumoconiosis under 20 C.F.R. § 727.203(a)(2) and (a)(4) because of his qualifying ventilatory studies and reasoned medical opinions.  Dante further acknowledges that rebuttal is not possible under 20 C.F.R. § 727.203(b)(1) or (b)(2) as Jones is not presently performing, or able to perform, coal mine or similar work.  Dante, however, maintains that the ALJ erred in finding that it did not rebut Jones's presumption of disability under 20 C.F.R. § 727.203(b)(3) or (b)(4).

Rebuttal under 20 C.F.R. § 727.203(b)(3) "is not easy."  Lane Hollow Coal Co., 137 F.3d at 804.  To rebut under 20 C.F.R. § 727.203(b)(3), an employer must rule out any causal relationship

16

between the miner's disability and coal mine employment.  Id. Where multiple factors contribute to the coal miner's total disability, the employer is obliged to show that "the miner's primary condition, whether it be emphysema or some other pulmonary disease, was not aggravated to the point of total disability by prolonged exposure to coal dust."  Bethlehem Mines Corp. v. Massey, 736 F.2d 120, 124 (4th Cir. 1984).

Rebuttal at 20 C.F.R. § 727.203(b)(4) requires a showing that the miner does not have medical or legal pneumoconiosis.  Barber v. Dir., OWCP, 43 F.3d 899, 901 (4th Cir. 1995); see also Biggs v. Consolidation Coal Co., 8 Black Lung Rep. 1-317, 1-322 (Ben. Rev. Bd. 1985).  For the reasons elucidated below, we conclude that the ALJ's determination that Dante did not rebut the presumption of disability due to pneumoconiosis is supported by substantial evidence.

III.

A.

Dante maintains that the ALJ's decision is not supported by substantial evidence because he dismissed in toto the opinions of Drs. Castle and Fino based on a conclusion that they failed to consider legal pneumoconiosis.  As a consequence, Dante contends that the ALJ's decision must be vacated because he failed to consider relevant evidence and, in so doing, failed to discharge

17

his duty, and to abide by the directives of our previous opinion. Because we believe that the ALJ properly considered and discredited Drs. Castle and Fino's reasons for concluding that Jones does not have pneumoconiosis, we find Dante's assertion to be without merit.

The ALJ correctly dismissed several of Drs. Castle and Fino's reasons for concluding that Jones does not have pneumoconiosis, because they reflected a preoccupation with medical rather than legal pneumoconiosis. As stated above, medical and legal pneumoconiosis are distinct concepts, see Hobbs, 917 F.2d at 791, and to rebut the presumption of disability, Dante must address both conditions. Medical pneumoconiosis can generally be detected by x-ray and is characterized by fibrosis. Hobbs, 917 F.2d at 791; see also J.A. 200-01. Thus, the ALJ properly rejected Drs. Castle and Fino's assertions that if Jones were suffering from pneumoconiosis, he would manifest an abnormal diffusing capacity indicative of a fibrotic process, because fibrosis is not a required element of legal pneumoconiosis. J.A. 311. Likewise, in addressing Dr. Fino's impression that Jones's elevated lung volumes were not indicative of a fibrotic process, the ALJ correctly observed that Dr. Fino was concerned with medical rather than legal pneumoconiosis.[7] J.A. 311; see also Cornett v. Benham Coal, Inc.,

_____

[7]For the same reason, the ALJ implicitly rejected Drs. Castle and Fino's contentions that the absence of interstitial abnormality or x-ray evidence of pneumoconiosis suggests that Jones does not have pneumoconiosis. These symptoms are associated with medical, but not necessarily legal pneumoconiosis.

18

227 F.3d 569, 576 (6th Cir. 2000) (reversing the Board's decision to affirm a denial of benefits, in part, because Dr. Fino failed to consider legal pneumoconiosis when he concluded that the lack of fibrosis suggested that the claimant did not have pneumoconiosis).[8]

Thus, while the ALJ discredited some of Drs. Castle and Fino's assessments based on their heavy preoccupation with symptoms associated with medical rather than legal pneumoconiosis (such as fibrosis), he did not discredit their opinions as a whole based on their alleged failure to discuss legal pneumoconiosis. Rather, as shown below, the ALJ carefully considered and analyzed each of the reasons Drs. Castle and Fino cited for concluding that Jones does not have pneumoconiosis.

The ALJ considered Dr. Castle's conclusion that Jones does not suffer from a coal-induced impairment because he did not have a "mixed, irreversible obstructive and restrictive ventilatory impairment" indicative of pneumoconiosis. The ALJ properly accorded Dr. Castle less weight because his opinion was counter to

---

[8]We also note that Dr. Fino has expressed hostility toward the Act in asserting a belief, for example, that coal mine dust inhalation does not result in obstructive lung disease. See, e.g., Freeman United Coal Mining Co. v. Summers, 272 F.3d 473, 483 n.7 (7th Cir. 2001) ("Dr. Fino stated . . . that 'there is no good clinical evidence in the medical literature that coal dust inhalation in and of itself causes significant obstructive lung disease.'"). The Department of Labor has rejected Dr. Fino's view as "not in accord with the prevailing view of the medical community or the substantial weight of the medical and scientific literature." Id. (quoting 65 Fed. Reg. 79,920, 79,939 (Dec. 20, 2000)).

19

the case law, which holds that an "obstructive impairment without a restrictive impairment may be considered legal pneumoconiosis."[9] J.A. 310 (internal citations omitted).

The ALJ correctly concluded that Dr. Fino's findings regarding the relative flow of air through Jones's small and large airways was insufficient to rule out coal dust exposure as a contributor to Jones's impairment. Dr. Fino found that the flow of air through Jones's small airways was more reduced than the flow of air in his large airways. He attributed this finding to a smoking-induced disorder, because cigarette smoke can reach the lungs' small airways, whereas coal dust cannot. However, as the ALJ noted, Dr. Fino did not explain how coal mine dust could be eliminated as a factor in Jones's impairment "when the values for the airflow in both the small and large airways varied over time." J.A. 310-11 (emphasis added). Dr. Fino thus failed to address the ample evidence of reduced airflow in Jones's large airways.[10] This failure undermines Dr. Fino's report, because even if the reduced airflow in the small airways was due to smoking, Dr. Fino did not

---

[9]For the same reasons, the ALJ found that Dr. Castle's conclusion that Jones did not have reduced lung volumes (indicative of a restrictive impairment) did not bear on whether Jones has legal pneumoconiosis as legal pneumoconiosis includes obstructive disorders that do not have a restrictive component. J.A. 310.

[10]Each of the four pulmonary function studies that Jones has undergone since 1991 showed reduced flow of air through the Jones's large airways, as measured by the volume of air that Jones could forcefully expire in one second. J.A. 292, 82.

20

eliminate coal dust as a contributor to the reduction in the flow of air through Jones's large airways. At most, Dr. Fino's conclusion regarding the relative flow of air in Jones's small and large airways demonstrates that smoking had a deleterious effect on Jones's respiratory condition, a fact that is not in dispute.

The ALJ also considered and rejected Drs. Castle and Fino's contention that the fact that the pulmonary function studies showed a significant degree of reversibility in airway obstruction was sufficient to rule out coal mine dust as a factor. The ALJ reached this conclusion because the most recent pulmonary function studies showed minimal reversibility and Dante's experts did not state how much reversibility is necessary to eliminate coal dust as a causal factor. J.A. 311. We find no error in the ALJ's decision to accord more weight to the more recent pulmonary function studies, which did not show a significant degree of bronchoreversibility. Travis v. Peabody Coal Co., 1 Black Lung Rep. 1-314, 1-320 (Ben. Rev. Bd. 1977) (finding that if pneumoconiosis is progressive and irreversible, the most recent medical evidence is more probative than older information);[11] Lane Hollow, 137 F.3d at 804 (applying

---

[11]This Court rejected the "later [evidence] is better" standard where earlier and later pulmonary function studies produce irreconcilable results, i.e., where the later evidence shows signs of improvement, which run counter to the prevailing view that pneumoconiosis is a progressive disease. Adkins v. Dir., OWCP, 958 F.2d 49, 51-52 (4th Cir. 1992). We reasoned that under those limited circumstances an ALJ cannot simply assume that later evidence is better because the evidence suggests that one of the pieces of evidence is actually in error and the later study is just

21

later is better principle where the earlier x-rays were negative and later x-rays were positive for pneumoconiosis and were thus consistent with the progressive nature of pneumoconiosis). Nor do we believe the ALJ erred in discrediting Drs. Fino and Castle's opinions as they did not account for the most recent pulmonary function studies, which constitute probative evidence in the record. Milburn Colliery Co., 138 F.3d at 534 (holding that the ALJ erred in crediting a physician who had not considered all the relevant evidence regarding the claimant's condition); see also Stark v. Dir., OWCP, 9 Black Lung Rep. 1-36, 1-37 (Ben. Rev. Bd. 1986) ("[A]n administrative law judge may legitimately assign less weight to a medical opinion which presents an incomplete picture of the miner's health.").

---

as susceptible to error as the earlier. Id. Here, the 1998 and 1999 data can be reconciled and thus it is proper to accord the most recent evidence greater weight. Dr. Abrahams provides a logical explanation for the fact that bronchodilator treatment in 1998 resulted in improvement whereas in 1999 there was no improvement:

> On that first [breathing] test, he improved after the bronchodilator medication. When he came back the second time, his baseline test before giving him a bronchodilator was similar to the first test after the bronchodilator. So, basically, when he came back the second time, when we gave him the bronchodilator, there was no improvement on the test, sort of suggesting that he's sort of at his level of maximum improvement.

J.A. 259-60. Importantly, even though the 1998 study reflected significant reversibility, even with the improvement, Jones still manifested a respiratory or pulmonary disability pursuant to the regulations. Thus the bronchodilator medications aided Jones, but only to a limited degree.

22

We also find no error in the ALJ's decision to reject Drs. Castle and Fino's conclusion that the fact that Jones did not always have a productive cough suggested that he does not have industrial bronchitis.[12]   The ALJ properly discredited their opinions on the grounds that Dr. Castle was the only physician not to report a productive cough.[13]   J.A. 312.

Indeed, from 1976 to 1998, at least five physicians found that Jones experienced a productive cough and Dr. Castle's report was not inconsistent with the earlier findings.  See J.A. 69, 70, 72, 73, 77.   Only Dr. Castle's deposition testimony and Dr. Fino's consultative report contradict the consistent reports of productive cough.   In his deposition, Dr. Castle testified that during his evaluation of Jones, Jones complained of a cough that was "dry, not productive of mucus."  J.A. 100.  Likewise, in his report, Dr. Fino stated that Jones had complained to Dr. Castle of a "dry cough."  J.A. 79.  In fact, however, Dr. Castle's report, a summary of his

---

[12]Under the prevailing view, industrial bronchitis "is characterized by cough and mucous production."  See, e.g., J.A. 82 ("Minimal obstructive lung disease has been described in working coal miners and has been called industrial bronchitis.  This condition is characterized by cough and mucous production . . . .").

[13]Dante makes much of the fact that in 1995, a technician commented that Jones had "[shortness of breath], but no cough." J.A. 234.   According to Dante, this proves that Jones had a variable history of cough.   However, given that all of the physicians who have evaluated Jones, including Dr. Castle, noted a history of cough, we think it appropriate for the ALJ to have discredited the technician's uncorroborated remark.

23

findings on the date of evaluation, states that Jones had "a cough some of the time but <u>generally</u> this is a dry cough, not productive of any mucus." J.A. 53 (emphasis added). Accordingly, we find that the ALJ's refusal to ignore the consistent reports of productive cough was rational, particularly when Dr. Castle's written report does not state that Jones did not have a productive cough.[14] Because Drs. Castle and Fino seemingly ignored the multiple reports of productive cough in finding that Jones does not exhibit symptoms of industrial bronchitis, we conclude that the ALJ properly found that Drs. Castle and Fino's opinions are not entitled to considerable weight. <u>Milburn Colliery Co.</u>, 138 F.3d at 534.[15]

_____

[14]Likewise, the ALJ could have discredited Drs. Castle and Fino's conclusion that Jones does not have industrial bronchitis on additional grounds. For instance, the ALJ could have found that both Drs. Castle and Fino failed to rebut the presumption because they did not suggest that industrial bronchitis is capable of cure. <u>See</u> J.A. 198, 222. Rather, they simply expressed a belief that the "symptoms" of industrial bronchitis abate after one leaves the mines. <u>See</u> J.A. 198, 217-18. Accordingly, their conclusions were not in conflict with those of Dr. Abrahams, who explained that

> the symptoms of the mucus production and the cough can improve in some people who are removed from the source of the bronchitis. And even the pulmonary function test can improve to a small degree; but, certainly, plenty of people are left with permanent obstructive airway disease, you know, from chronic bronchitis.

J.A. 250-51.

[15]Although an ALJ cannot just perform a numerical count of the opinions and assume that the correct position is that which is shared by the greatest number of physicians, <u>see</u> <u>Sterling Smokeless Coal Co. v. Akers</u>, 131 F.3d 438, 441 (4th Cir. 1997), this was not

24

In sum, we find that the ALJ considered and provided a thorough treatment of each of the evidentiary bases for Drs. Castle and Fino's determination that Jones is not suffering from a coal-induced or coal-aggravated respiratory or pulmonary impairment. Since we understand the ALJ's basis for finding that Dante had not met its onerous burden to establish rebuttal under 20 C.F.R. § 727.203(b)(3) or (b)(4), "we, and the APA, are satisfied." Lane Hollow Coal Co., 137 F.3d 799 at 803.[16]

B.

Dante, like the dissenting judge on the Board, contends that the ALJ erred in not evaluating Dr. Abrahams's evidence on remand. Again, we must disagree. The ALJ was not required to address Dr.

_____

what the ALJ did here. Rather, the ALJ permissibly failed to credit the physicians who did not account for the frequent, credible reports of productive cough consistent with industrial bronchitis.

[16]Dante argues that the ALJ erred in failing to address his previous reason for discrediting Drs. Castle and Fino's conclusion that Jones is not suffering from industrial bronchitis, namely that pneumoconiosis is an irreversible and progressive disease. We disagree. Dante strains our previous decision in asserting that we instructed the ALJ to examine again whether pneumoconiosis is necessarily a progressive and irreversible impairment. In that opinion, we merely indicated that even if pneumoconiosis is progressive and irreversible, that conclusion would not be enough to dispose of the question of whether Dante had rebutted the presumption of total disability due to pneumoconiosis. In so doing, we effectively instructed the ALJ to review all of the evidence Dante presented in rebuttal and not merely to dismiss the rest of the evidence without considering it. In performing a thorough analysis of the various reasons Dante propounded in an effort to show that Jones is not suffering from a coal-induced respiratory disorder, the ALJ has complied with our instructions and with the mandate of the APA.

25

Abrahams's evidence of total disability anew because his inquiry was properly confined to the narrow question of whether Dante had rebutted the presumption. Since Dante conceded that Jones has met the presumption, the ALJ did not need to discuss Dr. Abrahams's evaluation as it was not relevant to the rebuttal of the presumption. See Mullins Coal Co., 484 U.S. at 150 ("[N]othing in the regulation requires all relevant medical evidence to be considered at the rebuttal phase; such evidence must simply be admissible at some point during the proof process."). Since the ALJ gave a thorough treatment of Dr. Abrahams's evidence in his initial opinion invoking the presumption, he did not need to revisit that evidence on remand.

Moreover, the ALJ was not obligated to discuss Dr. Abrahams's findings because it was the employer who had the burden of rebutting the presumption of total disability due to pneumoconiosis. If an employer does not meet its burden, the employee necessarily prevails without producing any evidence beyond that which gave rise to the presumption. Barber, 43 F.3d at 901 (employer loses where it fails to rebut the employee's presumption of total disability). To find otherwise, would be to impose an additional burden of production on the employee that is not manifest in the Act. This, the law does not require. Accordingly, we find Dante's contention to be without merit.

We now turn to Dante's final claim that the ALJ erred in failing to reopen the evidence after making reference to the newly codified definition of legal pneumoconiosis. Although the ALJ's reference to the new definition of legal pneumoconiosis was perhaps unnecessary or even ill-advised, it does not constitute an error requiring reversal.

The ALJ referenced the definition of legal pneumoconiosis now present in the federal regulations for the premise that an obstructive impairment alone may constitute legal pneumoconiosis. He did so as follows:

> Dr. Castle dismisses the miner's coal mine dust exposure as a cause of his obstructive airways disease because there was not a "mixed, irreversible obstructive and restrictive ventilatory impairment." However, this is contrary to the case law, which holds that an obstructive impairment without a restrictive impairment may be considered legal pneumoconiosis. In addition, the new regulations codify the case law in defining legal pneumoconiosis as including "any chronic restrictive or pulmonary disease arising out of coal mine employment." [20 C.F.R.] § 718.201(a)(2)[(2002)](emphasis added).

J.A. 310 (internal citations omitted).[17] Dante maintains that the ALJ committed a due process violation when he failed to reopen the evidence to allow Dante to address the new definition of legal

---

[17]Under the revised definition, "'[l]egal pneumoconiosis' includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a)(2).

pneumoconiosis. Although there are instances in which reopening the record is required to safeguard due process rights,[18] this is not one of those instances.

The ALJ's reference to the revised definition of legal pneumoconiosis did not prejudice Dante, because the definition was only cited for a principle that existed in the case law, namely that pure obstructive diseases can constitute legal pneumoconiosis. See, e.g., Richardson v. Dir., OWCP, 94 F.3d 164, 167 n.2 (4th Cir. 1996) ("[chronic obstructive pulmonary disease], if it arises out of coal-mine employment, clearly is encompassed within the legal definition of pneumoconiosis." (citing Warth v. Southern Ohio Coal Co., 60 F.3d 173, 175 (4th Cir. 1995)); see also Heavilin v. Consolidated Coal Co., 6 Black Lung Rep. 1-1209, 1-1212 (Ben. Rev. Bd. 1984) ("Dr. Modi identified claimant's emphysema as moderate obstructive pulmonary disease and indicated that this condition is related to dust exposure in claimant's coal mine employment. We thus hold that Dr. Modi's diagnosis of emphysema in this case meets the statutory and regulatory definition of pneumoconiosis"). As this principle was manifest in the case law in 1998, at the time Drs. Castle and Fino evaluated Jones's condition, and in 2001 when

---

[18]See, e.g., Harlan Bell Coal Co. v. Lemar, 904 F.2d 1042 (6th Cir. 1990) (employer's due process rights violated where the ALJ relied on a decision rendered after the presentation of evidence was closed, which created a substantial and unanticipated change in the law without giving the employer an opportunity to respond to the change in law).

28

Judge Leland issued his first opinion, Dante has had ample opportunity to address the question of whether an obstructive disorder without a restrictive component can be pneumoconiosis. See Faries v. Dir., OWCP, 909 F.2d 170 (6th Cir. 1990) (Since the new standard "was the applicable standard in effect when petitioner's claim was first considered by the ALJ, petitioner's assertion that the [Board] took his benefits away solely on a new interpretation of a regulation without giving him an opportunity to be heard is baseless.").

Moreover, Dante does not actually argue that the new definition of legal pneumoconiosis established for the first time that a pure obstructive disorder may constitute legal pneumoconiosis. Instead, at oral argument, Dante argued that the new definition announced that legal pneumoconiosis encompasses pure restrictive impairments. Even if Dante is correct that a restrictive impairment alone was not previously subsumed within the definition of legal pneumoconiosis, this conclusion has no bearing here. No one suggests that Jones suffered from a restrictive impairment. Rather, the physicians concluded that his impairment was an obstructive one. The ALJ did not refer to the new definition of legal pneumoconiosis in an effort to draw upon the conclusion that pure restrictive impairments constitute pneumoconiosis, but rather to support the uncontroverted and settled conclusion that a pure obstructive disorder may be legal

pneumoconiosis.  Accordingly, the ALJ's limited reference to the new definition of legal pneumoconiosis did not prejudice Dante and does not require remand.

IV.

For the reasons outlined above, we affirm the award of black lung benefits to Jones, because Dante has not carried its burden of rebutting the presumption of disability due to pneumoconiosis accorded Jones.  We thus decline Dante's invitation to unnecessarily prolong this already protracted litigation.

<u>AFFIRMED</u>

WILKINS, Chief Judge, dissenting:

The majority denies Dante Coal Company's petition for review of the Board order affirming the ALJ's decision awarding black lung benefits. Because I would vacate the order and remand for additional proceedings, I respectfully dissent.

I.

In my view, substantial evidence did not support the ALJ's decision to discredit Dr. Castle's and Dr. Fino's opinions on the basis that they were not well reasoned. Indeed, it is the ALJ's analysis, not that of Drs. Castle and Fino, that I find to be poorly reasoned. I will briefly describe the opinions offered by these doctors and then address the ALJ's reasons for discrediting them.

A.

Important to my disagreement with the majority is my understanding of not only the doctors' individual reasons for concluding that Jones' disability was not coal-dust related but also how those reasons fit together in a global sense. It was undisputed that Jones' extensive exposure to coal dust would have been sufficient to cause a miner to develop pneumoconiosis, but it was also clear that other factors, such as Jones' many years of cigarette smoking, could cause an impairment of the type Jones had. The critical questions before the doctors were whether there

31

actually was any causal relationship between Jones' disability and his coal mine employment and whether Jones suffered from medical or legal pneumoconiosis. Both Dr. Castle and Dr. Fino, after considering Jones' entire medical history, including a wide range of factors, answered these questions in the negative. The factors cited by the doctors as supporting this conclusion served different purposes: Some supported the proposition that cigarette smoking caused Jones' impairment, some tended to show that he did not have medical pneumoconiosis, and some indicated that he did not suffer from any other form of legal pneumoconiosis.

Dr. Castle specifically relied on several factors in concluding that any pulmonary impairment that Jones had was "not related to coal mining employment, but is the type of impairment seen with tobacco smoke induced lung disease." J.A. 64. He noted that Jones did not have evidence of interstitial fibrosis and that the x-ray evidence was not indicative of pneumoconiosis. He also observed that the physiologic studies performed on Jones showed evidence of "moderate airway obstruction without any restriction or diffusion abnormality," a type of impairment "typically seen in those individuals who have a long history of tobacco abuse," but not typically seen "[w]hen coal workers' pneumoconiosis causes clinically significant impairment." Id. at 63.

Also informing Castle's determination was the fact that Jones' respiratory condition improved significantly in response to

32

bronchodilator medications. Castle stated that the type of airway obstruction associated with pneumoconiosis generally is not reversible. Castle noted that Dr. Abrahams had opined that Jones' airway obstruction was due to chronic bronchitis. Castle rejected that notion, however, on the basis that Jones had left the mining industry many years ago and "[t]he airway obstruction [caused by chronic bronchitis] generally abates after the exposure [to coal dust] ceases." Id. at 64. Because Jones had complained to Castle of only a dry cough, Castle also ruled out chronic bronchitis since Jones did not have "a chronic cough productive of mucus on a regular basis." Id. at 101. And, Castle reasoned that even if Jones had had such a cough, it would most likely have been caused by Jones' gastroesophageal reflux disease rather than any coal-related condition.

Dr. Fino's analysis was generally similar to Dr. Castle's. Fino concluded that Jones' disability "has nothing to do with the inhalation of coal mine dust," but rather, "is due to smoking." Id. at 83. Like Castle, Fino noted the absence of the usual indications of medical pneumoconiosis, such as x-ray evidence or signs of fibrosis of the lung tissue. Fino also reasoned that the fact that Jones' small airway flow was proportionally more reduced than that of his large airways was "consistent with conditions such as cigarette smoking, pulmonary emphysema, non-occupational chronic bronchitis, and asthma," but "not consistent with a coal dust

33

related condition." Id. at 82. Fino also determined that the reversibility of Jones' lung condition--the improvement after bronchodilator treatment--indicated that it was not coal-dust related. And, like Castle, Fino specifically ruled out coal-dust related chronic bronchitis for two independent reasons: (1) because it "resolves within six months of leaving the mines," id., and (2) because the evidence indicated that Jones at times did not have a mucus-producing cough.

B.

I will now address seriatim the ALJ's reasons for concluding that Castle's and Fino's opinions were poorly reasoned. The ALJ first discredited Castle on the basis that he allegedly ruled out the possibility that Jones' impairment was coal-dust related because "there was not a 'mixed, irreversible obstructive and restrictive ventilatory impairment.'"[*] Id. at 310 (quoting Dr. Castle's report at J.A. 63). The ALJ concluded that Castle's analysis was contrary to the principle established in this circuit that an obstructive impairment that is not restrictive may constitute pneumoconiosis. See Warth v. S. Ohio Coal Co., 60 F.3d 173, 174-75 (4th Cir. 1995).

---

[*]Obstructive lung diseases impair the ability of the lungs to expel air, while restrictive lung diseases reduce the ability to bring air into the lungs. See Gulf & W. Indus. v. Ling, 176 F.3d 226, 229 n.6 (4th Cir. 1999).

34

The ALJ's conclusion that Castle's opinion is inconsistent with Warth is itself in conflict with Stiltner v. Island Creek Coal Co., 86 F.3d 337 (4th Cir. 1996), a case not discussed by the majority. There, the black lung benefits claimant argued that the coal company's medical experts ran afoul of Warth by opining that if the miner's impairment were coal dust related, the miner "likely" would have had a restrictive impairment. Stiltner, 86 F.3d at 341 (emphasis omitted). Based on the experts' use of "likely" and on the fact that they ruled out coal dust as a cause of the miner's impairment based on the miner's entire medical history, we held that their opinions were not at odds with Warth. See id.

Here, as in Stiltner, the statement at issue was qualified. In the quotation cited by the ALJ, Castle stated merely that "[w]hen coal workers' pneumoconiosis causes clinically significant impairment, it does so generally by causing a mixed, irreversible obstructive and restrictive ventilatory impairment." J.A. 63 (emphasis added). Also as in Stiltner, Castle relied on the type of Jones' impairment only as one of many factors that, considered together, demonstrated that Jones' impairment was not coal-dust related. Thus, under Stiltner, the ALJ's criticism is misplaced.

The ALJ next discredited Castle and Fino when the ALJ concluded that they directly inferred from the absence of significant fibrosis in Jones' lungs that his impairment was not

35

coal-dust related. The ALJ reasoned that the doctors' analyses overlooked that it is possible for a miner to have legal pneumoconiosis (such as coal-dust induced chronic bronchitis) without having fibrosis. Again, however, it is only the ALJ's misreading of the doctors' statements that produces any inconsistency. As I discussed above, the absence of fibrosis was only one part of the doctors' basis for concluding that Jones' impairment was not coal-dust related. While it is true that the absence of fibrosis does not <u>by itself</u> show that Jones' disability was not related to coal dust, it was properly considered by both doctors as an important piece of their analyses.

In approving of the ALJ's analysis, the majority appears to fall prey to the same error committed by the ALJ. The majority correctly acknowledges that to rebut the presumption of disability, Dante had to address both medical and legal pneumoconiosis. <u>See ante</u>, at 18. Yet, when Castle and Fino cite factors, such as the absence of fibrosis, that indicate that Jones did not suffer from medical pneumoconiosis, the majority accuses the doctors of "preoccupation with medical rather than legal pneumoconiosis." <u>Id.</u> From such a criticism, one might assume that Castle's and Fino's analyses presumed that if Jones did not have medical pneumoconiosis, he did not have legal pneumoconiosis either. But that was clearly not the case. Both doctors undeniably demonstrated an understanding of the distinction between medical

36

and legal pneumoconiosis, see, e.g., J.A. 200-01 (Castle); id. at 181, 220-21 (Fino), and both offered several reasons why they believed Jones did not suffer from non-medical pneumoconiosis. Most importantly, the doctors primarily ruled out chronic bronchitis--the condition Dr. Abrahams concluded that Jones suffered from--because chronic bronchitis abates quickly once a miner is no longer being exposed to coal dust. Contrary to the majority's conclusion that "the ALJ carefully considered and analyzed each of the reasons Drs. Castle and Fino cited for concluding that Jones does not have pneumoconiosis," ante, at 19-20, the ALJ never addressed this critical point.

The ALJ also discredited Castle and Fino because they concluded that Jones' 1998 pulmonary function study showing a marked degree of reversibility in the degree of obstruction reinforced their opinions that coal dust was not a cause of Jones' impairment. The ALJ observed that two 1999 studies showed only minimal reversibility and noted that Castle and Fino did not explain why, in light of the minimal additional improvement, that coal dust exposure could not be a cause of Jones' impairment.

The ALJ's conclusion that the doctors did not explain the apparent reduction in reversibility is simply incorrect. In his November 1999 deposition, Castle explained the fact that the 1999 tests did not produce the same degree of reversibility as the 1998 test by noting that Jones "was much more maximally dilated" in 1999

and observing that once a maximum amount of bronchodilatation occurs, further bronchodilatation should not be expected. J.A. 206. Having overlooked this explanation, the ALJ never undertook to evaluate it.

The ALJ also discredited the doctors for failing to "explain how much reversibility was necessary to rule out coal mine employment as a causal factor." Id. at 311. Yet, Dr. Castle did just that in his November 1999 deposition:

> [T]he FVC and FEV-1 are the two parameters that we utilize to judge reversibility, and in this case, the prebronchodilator forced vital capacity was 70 percent of predicted or 2.58 liters. [Jones] improved by 23 percent after the inhalation of a bronchodilator to 3.17 liters or 86 percent of predicted.
>
> That is a very significant degree of reversibility, and in many circumstances, it would be utilized as a diagnosis of asthma or bronchial asthma. This--over a 12 percent degree of reversibility is considered significant if it's also more than 200 c.c.'s, and in fact that is the case, and the FEV-1 improves from 1.35 liters to 1.67 liters, or 24 percent of predicted, so that shows that there is, on some occasions, at any rate, some degree of reversibility.

Id. at 198-99 (emphasis added).

Without acknowledging this disconnect between the record and the ALJ's criticisms of Castle and Fino, the majority concludes that the ALJ rejected Castle's and Fino's positions regarding reversibility because he "accord[ed] more weight to the more recent pulmonary function studies, which did not show a significant degree of bronchoreversibility." Ante, at 21. However, nothing in the ALJ's decision indicates that he undertook such a weighing. See

38

J.A. 311 (ALJ's order concluding that the flaw in Castle's and Fino's opinions relating to reversibility was that they "failed to explain why coal mine dust exposure did not contribute to [Jones'] obstructive airways disease when the amount of reversibility in the 1999 studies was minimal, and they did not explain how much reversibility was necessary to rule out coal mine employment as a causal factor"). In fact, there was nothing to weigh because the test results were not contradictory. Castle and Fino both explained that the reversibility demonstrated in 1998 reinforced their opinions that Jones was not impaired by pneumoconiosis, and Castle explained that the change between 1998 and 1999 provided "further" proof that Jones' impairment was "very significantly reversible" and thus not chronic bronchitis. Id. at 206.

The ALJ further concluded that Castle's and Fino's opinions were "entitled to less weight because their opinions are not based on all the evidence in the record (which they allegedly reviewed)." Id. at 312. In this regard, the ALJ referenced the fact that six medical reports in the record reported a history of a mucus-producing cough. Castle observed that when he examined Jones, Jones complained only of a dry cough, and Fino noted that Jones' history of mucus production was variable. Both doctors cited the lack of a consistently productive cough as supporting their conclusions that Jones did not suffer from chronic bronchitis.

39

The doctors' conclusions that Jones' mucus production was variable are not a substantial basis for concluding that their opinions were not based on all of the evidence in the record. A 1995 medical report indicated that Jones did not complain of a cough, and Castle reported that during his examination of Jones, Jones complained only of a dry cough. In light of this evidence indicating that Jones' mucus production was inconsistent, any conclusion that the doctors' description of Jones' mucus production as variable was due to a failure to consider the complete record could be based only on pure speculation.

The majority makes much of the fact that Castle's written report states only that Jones' cough "generally" was not productive of mucus. Id. at 53; see ante, at 24. This distinction makes no difference, however. The critical point was not that the cough was never productive of mucus but only that it was not consistently productive of mucus, as it would be if Jones suffered from chronic bronchitis. See J.A. 101 (Castle deposition); id. at 215 (Fino deposition).

Moreover, even assuming arguendo that Castle and Fino should have ignored the evidence to the contrary and assumed that Jones had a consistently mucus-producing cough, it still would not have affected their conclusions that Jones' impairment was not due to coal-dust related chronic bronchitis. Both doctors completely ruled out chronic bronchitis caused by coal mining based on their

40

belief that such a condition subsides within six months of the termination of exposure to coal dust. Indeed, Dr. Castle added that a more likely cause of any mucus-producing cough would be Jones' gastroesophageal reflux disease.

The ALJ further discredited Fino's opinion because Fino stated there was greater reduction in airflow in Jones' small airways than in his large airways, which is associated with a smoking-related condition or asthma, rather than a coal-dust induced condition. The ALJ noted that the airflow in both sizes of airways varied over time and that Fino did not explain how coal dust could be ruled out as a cause or aggravator of Jones' impairment in light of that fact.

Even if Fino's inference from the airflow reduction comparison could be discounted because he did not provide a more detailed explanation, that would not be sufficient to discredit Fino's entire opinion that Jones' impairment was not coal-dust related. Fino's reasons for his conclusion that Jones' impairment was not coal-dust related were many. And, again, his primary basis for rejecting the conclusion that Jones suffered from chronic bronchitis--namely, that such a condition abates within six months after the cessation of the coal dust exposure--was never even addressed by the ALJ.

41

II.

In sum, the analyses offered by Drs. Castle and Fino are both internally consistent and consistent with Fourth Circuit law. For the reasons discussed, there is no substantial evidence supporting the ALJ's decision to discredit these doctors' opinions as poorly reasoned. Indeed, many of the reasons offered by the ALJ for discrediting the doctors are simply factually incorrect. I would therefore grant Dante's petition and remand to the Board to in turn remand to an ALJ for further proceedings. Because the majority reaches a contrary result, I respectfully dissent.